Dennis E. WHITFIELD, Deputy Secretary of the United States Department of Labor, Plaintiff,

v.

Anthony TOMASSO, Daniel Cunningham, Theodore Nicolosi, Frank Van Cise, Robert Green, Eugene Brown, Annette Sacino, Louis Fenza, Allied Security Health and Welfare Fund, Allied International Union, Dome Insurance Company, Court Investment Co., Inc., Administrative Systems, Inc., International Financial Services, Ltd., Leo Bloom, Philip Bloom, Kathleen Tomasso, Herman Jaffe, and Salvatore Ponte, Defendants.

No. CV 84–4280.

United States District Court, E.D. New York.

April 14, 1988.

Polly A. Dammann, U.S. Dept. of Labor, Office of The Solicitor, Washington, D.C., for plaintiff.

Leopold, Gross, Sommers & Israel, P.C., Brooklyn, N.Y., for defendant Jaffe.

Robert Sparago, Knoxville, Tenn., for defendant Administrative Systems.

Gerald V. Dandeneau, Melville, N.Y., for defendants Brown, Green, Sacino, Fenza, Allied Sec. Health and Welfare Fund and Allied Intern. Union.

George H. Logan, Christiansted, St. Croix, U.S. V.I., for defendant Dome Ins. Co.

J. Kevin Meneilly, Jericho, N.Y., for defendant Van Cise.

Vincent A. Pirrone, Long Beach, N.Y., for defendant Nicolisi.

Arnoff & Merin, New York City, for defendant Cunningham.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WEXLER, District Judge.

This matter consists of three consolidated cases: *Whitfield* (formerly *Brock*) *v. Tomasso, et al.*, CV 84–4280; *Brown v. Tomasso, et al.*, CV 84–2634, and *Benvenuto v. Schneider, et al.*, CV 85–1664. The cases were tried before the Court, and the Court hereby makes the following findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 52(a) in case number CV 84–4280, *Whitfield v. Tomasso.*

## FINDINGS OF FACT

1. The Allied Security Health and Welfare Fund (the "Fund") is an employee welfare benefit plan sponsored by the Allied International Union ("Allied" or the "Union"), an employee organization representing security guards in the New York City metropolitan area and in Washington, D.C. The Fund has provided medical, dental, optometrical, and prepaid legal benefits for its members, the contributions for which have been wholly borne by employers having collective bargaining agreements with the union. At all times the Fund has shared office space with Allied, and many employees of the Fund were also employees of Allied.

2. In the mid 1970's, Daniel Cunningham controlled the union and in October 1982 Cunningham was sentenced to five years imprisonment for a variety of union and Fund crimes. *United States v. Cunningham*, CR 81–480–01 (J. Glasser, E.D. N.Y.). Cunningham appointed Anthony Tomasso, who served under Cunningham in the Union, to succeed Cunningham as Allied's President, Union Trustee and Fund Manager. Management of the Fund, which had been operating under one Union Trustee, defendant Cunningham and one Employer Trustee, Theodore Nicolosi, was altered by the defendant Tomasso in early 1983 to require two Union Trustees and two Employer Trustees. Tomasso's intention was that the United States Departments of Labor and Justice would conclude that crime-free management was in place.

3. Nicolosi was selected by Cunningham as the Employer Trustee because he was malleable. Nicolosi signed Fund minutes without knowledge of what took place at the meeting, took no interest in and cared little of what was happening to the Fund. He readily followed orders of others, without taking into account the best interests of the Fund.

4. Pursuant to the plan of four trustees, Tomasso instructed Nicolosi to resign and, on or about January 20, 1983, hand-

picked his secretary in the Union office, defendant Annette Sacino, as the second Union Trustee. Tomasso also hand picked defendants Van Cise and Green as the new Employer Trustees. Tomasso chose Sacino for the same reason that Cunningham had selected Nicolosi, the ability to manipulate and control the actions of the Trustees.

5. Van Cise accepted the position of new Employer Trustee with an understanding that he would be permitted to grossly under report the number of Union members for which dues and contributions were submitted. Thus, Van Cise was able to retain a significant percentage of the dues previously checked off from his employees' payroll and was able to save a significant percentage of the contributions properly owned by his company. Green also agreed to become the new Employer Trustee in consideration of the fact that a significant back contribution owed the Fund by Green's company was greatly reduced. With such illegal consideration Tomasso was assured of the loyalty of Van Cise and Green and he, Tomasso, completely controlled the Fund.

6. At no time did Trustees Nicolosi, Van Cise, Green or Sacino review the Fund trust instruments, and they were unaware of their responsibilities under those documents. Additionally, Brown, although aware of his Trustee status, had no notion of his responsibilities as a fund fiduciary.

### INVESTMENTS IN DOME INSURANCE COMPANY

7. During the period from November 23, 1982 through July 7, 1983, the Fund purchased six certificates of deposit (CDs) from Dome Insurance Company ("Dome"). Dome was a multi-lines insurance company founded by defendant Leo Bloom in 1979 and incorporated under the laws of the U.S. Virgin Islands with offices in Christiansted.

8. The Fund's purchases of CDs from Dome constituted unsecured loans from the Fund to Dome. The CDs were purchased by the Fund in part to provide Tomasso and defendant Mitchel Goldblatt, the Fund's attorney, among others, with "kickbacks," and Tomasso never expected the Fund to recover any of the principal amount of the loans to Dome.

9. Trustees Tomasso and Nicolosi approved the purchase of the first Dome CD on or about November 23, 1982. The twelve month $120,000 CD bore 14% interest and was due November 23, 1983. This investment of $120,000 represented twenty-five percent of the Fund's available assets.

10. As the *quid pro quo* for purchasing this CD, on December 14, 1982, defendant Bloom caused another of his companies, International Financial Services, Ltd. ("IFS") to make a mortgage loan of $120,000—that being the money invested by the Fund in the Dome CD—to one Michael Franzese, the person who previously helped arrange for Tomasso to become President of the Union.

11. Trustees Tomasso and Nicolosi did not review the Dome financial reports which were available at the time of the first CD purchase, nor did they consult with anyone qualified to evaluate such an investment. Had the Trustees caused an appropriate investigation into the merits of the proposed transaction, they would have discovered the following:

A. The December 21, 1980 Dome Annual Financial Statement reflects Dome ownership of: a $2,000,000 Barclays CD; a mining company valued at $2,000,000; an "unaffiliated" investment company valued at $360,000; and additional paid-in capital of $1,510,300 (reflecting an election by holders of convertible debentures).

B. The $2,000,000 Barclays CD was security for $2,000,000 liability and was thus completely encumbered; the mining company had been purchased for, and was worth no more than, $59,000; the investment company ("Allied Investment Corp.") was a worthless and dormant company also owned by Bloom and for which no money had been paid; and the holders of the convertible debentures had not paid anything for their corporate obligations. Thus, these Dome holdings were largely worthless and the company assets greatly overstated.

C. The June 30, 1981 Dome Interim Financial Statement reflects the loss of the $2,000,000 Barclays CD, a net decrease in working capital of $2,305,563, the acquisi-

tion of an oil company for $2,000,000, and additional paid-in capital of $2,670,300 (an increase of $1,160,000 from the prior statement, reflecting a second election by holders of convertible debentures).

D. The oil company had been purchased for no more than $50,000, and the holders of the convertible debentures had not paid anything for their corporate obligations. Thus, Dome's assets were again greatly overstated. The Trustees did not inquire into these facts and were ignorant of them when the Dome CD was purchased.

12. The Board of Trustees increased from two (Tomasso and Nicolosi) to four (Tomasso and Sacino representing the Union, and Van Cise and Green representing the employers) on or about January 20, 1983. Trustess Tomasso, Sacino, Green and Van Cise approved the purchase of a second Dome CD on or about March 10, 1983. This twelve month $70,000 CD bore 14% interest and was due March 10, 1984. The aggregate Dome investment of $190,000 (for the two CDs) represented approximately thirty-two percent of the Fund's available assets.

13. Trustees Green and Van Cise were unaware at the time of the purchase of the second Dome CD for $70,000 that the Fund had previously purchased a Dome CD for $120,000.

14. A third Dome CD was purchased on March 24, 1983. This twelve month $50,000 CD bore 14% interest and was due March 24, 1984. At this point, the aggregate Dome investment of $240,000 represented approximately forty-one percent of the Fund's available assets.

15. A fourth Dome CD was purchased on April 28, 1983. Trustee Tomasso signed the check, payable to Dome for $50,000, and directed a Fund employee to forge Van Cise's signature to the check. This twelve month $50,000 CD bore 14% interest and was due April 28, 1984. At this point, the aggregate Dome investment of $290,000 represented approximately forty-eight percent of the Fund's available assets.

16. On February 16, 1983 IFS lent Tomasso (and his wife Kathleen) $17,500 for the downpayment on the purchase of a house, and on April 29, 1983 IFS lent Tomasso (and his wife) $160,000 as a mortgage for the house. These funds were given in exchange for the second, third, and fourth Dome CDs. The Trustees and attorney Goldblatt knew of these loans and that they were also from a Bloom-controlled company. In addition, Bloom gave Tomasso outright $10,000.

17. A fifth Dome CD was purchased on May 20, 1983. To facilitate this purchase, the Fund made an early withdrawal of a $200,000 certificate of deposit it had purchased at Citibank, thereby incurring an early withdrawal interest penalty in the sum of $2,600. This twelve month $250,000 Dome CD bore a 16% interest and was due April 23, 1984. The aggregate Dome investment of $540,000 represented approximately eighty-seven percent of the Fund's available assets.

18. A sixth Dome CD was purchased July 7, 1983. This twelve month $50,000 CD bore 14% interest and was due July 8, 1984. The aggregate Dome investment of $590,000 represented approximately eighty-nine percent of the Fund's available assets.

19. The December 31, 1982 Dome Annual Financial Statement reflects the acquisition of a $2,600,000 Pacific National Bank CD, the exchange of the mining company (at a value of $1,000,000) in partial payment for U.S. Treasury bonds having a November 15, 2011 redemption value of $5,397,000 (and reflected in the financial statement as having an investment value of $4,285,618), and increased additional paid-in capital of $2,785,615. The statement also reflects Dome CDs ["Investment Certificates"] bearing 14% interest issued for $190,000. Had the Trustees caused an appropriate inquiry, they would have discovered that Pacific National Bank was a sham bank founded by Leo Bloom, consisting only of a post office box in Anquilla, B.W.I., and thus the $2,600,000 asset (which represented 85.5 percent of Dome's total "deposits" of $3,029,569) did not exist; and that the U.S. Treasury Bonds had a contemporaneous value of no greater than $324,000. The Trustees did not inquire into these facts and were ignorant of them when the Dome CDs were purchased. In addition, the 1982 Dome Annual Statement filed with the Vir-

gin Islands Insurance Department, reflecting the company's condition as of December 31, 1982, indicates significantly different figures than the December 31, 1982 Dome Annual Financial Statement. Had the Trustees reviewed these financial documents they would have detected such discrepancies.

20. Although Trustees Tomasso, Sacino, Van Cise and Green considered favorable statements about Dome by attorney Goldblatt and John Rief, a chartered life insurance underwriter who served as the Fund's insurance consultant from 1979 until 1984, neither Goldblatt nor Rief was qualified to render investment advice to the Trustees as to the appropriateness of investing in Dome, and the Trustees did not consult anyone who was so qualified. Further, these Trustees did not cause an appropriate inquiry into Dome at any time prior or subsequent to the purchase of the second through sixth Dome CDs. Had they done so they would have discovered the financial condition of Dome as described above.

21. The Trustees did not review the report of Dome in *Best's Insurance Reports.* Had they done so they would have discovered that Dome was unrated by Best because it had not yet been in existence for five years, a prerequisite to rating.

22. In causing the Fund to make the loans to Dome, the Trustees did not weigh the potential risk of investing in "certificates of deposit" which were not insured (as are the federal bank or saving and loan CDs) up to $100,000 by the Federal Deposit Insurance Corporation and the Federal Savings and Loan Insurance Corporation, nor did the Trustees consider diversification of Fund investments in an effort to protect Fund assets.

23. Leo Bloom's name does not appear on either the Dome prospectus or brochure as an officer, director or employee of the company. Had the Trustees caused an appropriate inquiry, they would have discovered that Bloom's name was purposely omitted because the laws of the Virgin Islands forbade a convicted felon from serving as an officer or director of an insurance company. The Trustees also failed to inquire into the background and qualifications of defendant Philip Bloom, son of Leo Bloom, whose name appears in Dome records as president of the company. Appropriate investigation would have disclosed that Philip Bloom was an underwater welder by training and education and had no insurance industry experience.

24. The Dome scheme collapsed during the latter part of 1983. On April 17, 1984 U.S. District Judge David O'Brien of the U.S. District Court for the District of Puerto Rico ordered Dome into receivership, and its assets have been liquidated.

25. The Trustees should not have invested in Dome Insurance Company CDs as CDs are generally issued by banking institutions and not insurance companies. Insurance companies that do issue CDs are generally life insurance companies. The Dome Insurance Company was not a life insurance company. The Trustees should have investigated the quality and credit worthiness of Dome. In addition, the Trustees should have investigated why Dome was paying 14–16% interest while traditional CDs and Treasury Bills were paying 8–9% interest. Further, if the Trustees had checked *Best's Insurance Reports* they would have discovered that Dome Insurance Company was not rated. Certainly, they should have been alerted to that fact.

26. If the Trustees would have investigated they would have discovered that Dome Insurance Company had financial problems and was not a prudent investment.

27. As noted in ¶ 16, defendant Bloom, through IFS, loaned defendant Tomasso and his wife a total of $177,500 for the purchase of a house, and Bloom gave Tomasso an additional $10,000 as a *quid pro quo* for causing the Fund to loan money to Dome. As part of the agreement between Bloom and Tomasso, Bloom and IFS forgave a total of $10,316.28 in payments on the loans.

28. The Tomasso residence was sold at a profit in May 1984. Proceeds from the sale in the amount of $72,500 were paid to the Fund on behalf of Bloom and IFS, purportedly in partial satisfaction of the Dome debt.

## TOMASSO, GOLDBLATT & FENZA'S VACATION IN THE VIRGIN ISLANDS

29. Mitchell Goldblatt was the Fund attorney during the period that the Fund purchased the Dome C.D.'s from November 23, 1983 through July 7, 1983.

30. Goldblatt was in attendance at the first meeting on November 23, 1982 when the Trustee authorized the purchase of $120,000 of Dome C.D.'s. The minutes concerning the purchase of the balance of the Dome C.D.'s does not reflect the presence of Goldblatt. Goldblatt's initial acquiescence in the first purchase was a stamp of approval of subsequent purchases. At no time did Goldblatt, the Fund attorney, raise warnings or questions concerning the continuing purchases. Goldblatt, who had received illegal considerations emanating from Dome, had a duty to alert the Trustees which he failed to do. Goldblatt had a continuing duty to alert the Fund as their attorney and failed to do so, making him responsible even though not present at the meeting of the subsequent purchases.

31. The defendants Louis Fenza, Michael Goldblatt and his family and Anthony Tomasso and his family vacationed in the Virgin Islands at the expense of Dome Insurance Company and Bloom during April 6—April 11, 1983. Tomasso's lodging expenses of $1,242.44, Goldblatt's lodging expenses of $793.38, a private airplane excursion for defendant Tomasso costing $772.00 and a rental vehicle for Tomasso costing $262.50 were all paid for by Dome and Bloom. In addition, there was an indeterminate amount of food and liquor paid for by defendant Dome.

32. Trustees and parties in interest who take expensive vacations with or without their families either at the expense of the Fund or paid for by parties dealing with the Fund are subject to liability for ERISA violations. The practice of Trustees or parties in interest depleting funds of the Fund or by parties or associations dealing with the Fund must cease unless it can be justified. This Court will not tolerate expensive, non-productive trips for the purpose of giving the Trustees or their selected friends vacations.

## FUND CONTRIBUTIONS DEPOSITED AND RETAINED BY ALLIED

33. From 1981 to the present, Allied deposited into its own accounts and retained a total of $265,472.76 in employer contributions owed to and intended by the employers for the Fund. Allied used such amount for union business.

34. The fact that amounts were due to the Fund from Allied was known to the Trustees. Defendants Tomasso and Nicolosi were aware that amounts were due at least as early as November 23, 1982, and on or about January 12, 1983 accountant Greenberg reported to Trustees Tomasso and Nicolosi that $138,481.99 of Fund contributions had been deposited and retained by the Union and was outstanding. Greenberg made a corresponding entry on the books of the Fund reflecting that $139,481.39 was owed the Fund by the union.

35. Defendants Sacino, Green, and Van Cise were aware no later than July 1983 that amounts were owed to the Fund by the union. Accountant Steinberg's compilation reflecting the Fund condition as of December 31, 1982 transmitted to the Trustees under cover letter of July 14, 1983, indicated loans receivable from Allied of $139,422.06.

36. Trustees Tomasso, Sacino, Green and Van Cise did not implement or consider any mechanism to ensure that these defalcations, which had occurred in 1981–1982, would not continue throughout 1983. Allied's receipt and retention of Fund contributions continued, and between January 1, 1983, and June 1984 an additional $126,050.70 was deposited and retained, increasing to $265,472.76 the amount owed the Fund by Allied.

37. A promissory note for $265,472.76 was issued by Allied to the Fund on June 29, 1984. Under its terms Allied was to pay to the Fund $250.00 per week, which purportedly included interest at eleven percent. The promissory note was accepted by the Trustees on or about June 29, 1984. The Trustees knew that the payment schedule was insufficient to cover even the interest on the debt.

38. On or about December 6, 1984, the Trustees requested that the weekly repayments by Allied be increased to $500.00, an amount still insufficient to cover even the interest on the debt.

39. Nothing was paid by Allied to reduce its debt to the Fund between June 1984 and May 1986, and the Trustees took no action to compel Allied to reduce the debt during this period.

40. By a promissory note dated May 20, 1986, Allied affirmed that it owed the Fund $265,472.76, and revised its payback to the Fund, the new rate to be $3,017.35 a month (including interest at eleven percent) for a period of fifteen years.

## ADMINISTRATIVE EXPENSES

41. From 1979 to 1985, the Fund expended between seventeen and fifty-percent of its income on "administrative expenses," which included all administrative expenditures by the Fund as shown on the annual reports attached to Form 5500. Administrative expenses included salaries and wages, rent, telephone charges, office expenses, postage, furniture and equipment rental, insurance charges, seminar fees, automobile expenses, legal fees, accounting fees, insurance consultant fees, depreciation expense, union reimbursement expense, and payroll taxes. Administrative expenses, however, did not include benefits and premiums paid, nor did they include amounts paid to defendant Administrative Systems, Inc. ("ASI"), discussed below, since the payments to ASI were incorrectly included as benefits paid on Form 5500.

42. For the years 1979 through 1985, the Fund had income and incurred expenses as follows:

### For the Year Ending 12/31/79

| | | |
|---|---|---|
| Income | 597,693 | |
| Welfare Benefit Payments | 240,853 | |
| General & Administrative Expenses | 165,178 | (28% of income) |
| Excess Income Over Expenses | 191,662 | |

### For the Year Ending 12/31/80

| | | |
|---|---|---|
| Income | 765,316 | |
| Welfare Benefit Payments | 253,253 | |
| General & Administrative Expenses | 129,129 | (17% of income) |
| Excess Income Over Expenses | 382,934 | |

### For the Year Ending 12/31/81

| | | |
|---|---|---|
| Income | 1,028,538 | |
| Welfare Benefit Payments | 594,854 | |
| General & Administrative Expenses | 362,384 | (35% of income) |
| Excess Income Over Expenses | 71,300 | |

### For the Year Ending 12/31/82

| | | |
|---|---|---|
| Income | 1,177,092 | |
| Welfare Benefit Payments | 621,297 | |
| General & Administrative Expenses | 614,427 | (52% of income) |
| Excess Income Over Expenses | 58,632 | |

### For the Year Ending 12/31/83

| | | |
|---|---|---|
| Income | 1,210,984 | |
| Welfare Benefit Payments | 428,496 | |
| General & Administrative Expenses | 413,187 | (34% of income) |
| Excess Income Over Expenses | 369,301 | |

### For the Year Ending 12/31/84

| | | |
|---|---|---|
| Income | 1,083,273 | |
| Welfare Benefit Payments | 515,857 | |
| General & Administrative Expenses | 480,401 | (44% of income) |
| Excess Income Over Expenses | 87,015 | |

### For the Year Ending 12/31/85

| | | |
|---|---|---|
| Income | 1,136,124 | |
| Welfare Benefit Payments | 469,936 | |
| General & Administrative Expenses | 440,638 | (39% of income) |
| Excess Income Over Expenses | 225,550 | |

For the Nine Months Ending September 30, 1986
the Most Recent Financial Data Available

| | |
|---|---|
| Revenues | 895,028 |
| Benefits | 460,099 |
| Administrative Expenses | 273,835 (31% of income) |
| Excess of Revenues Over Expenses | 161,094 |

43. Trustees Nicolosi, Van Cise and Sacino were unaware of the percentage of Fund income consumed by administrative expenses.

44. On at least one occasion the Trustees were told by Fund accountant Steinberg that the administrative expenses were too high.

45. Salaries constituted the single largest Fund administrative expenditure. No records were kept which would adequately document the value of services received in exchange for the salaries.

46. In 1981, as part of its administrative expenses, the Fund reimbursed Allied in the amount of $93,893.00. In addition, on or about June 14, 1982, Trustees Cunningham and Nicolosi approved reimbursement to Allied by the Fund and the Related Allied Security Pension Fund for time allegedly spent by Cunningham on Fund business, and approved future payments by the Fund to Cunningham. As a result, Allied was reimbursed $94,011.06 for work allegedly done by Cunningham from 1977 through May 31, 1982, in addition to the $93,893.00 paid to Allied in 1981 referred to above.

47. In addition to the expenses described above, which were reported as administrative expenses on the Fund's Form 5500s, the Trustees caused the Fund to make other payments to ASI, which were incorrectly reported as benefit payments on the Fund's Form 5500s.

48. ASI was founded and controlled by defendant Leo Bloom and Larry Lauver (a defendant in consolidated case number CV 84–2634) with the express purpose of serving as a third party administrator for the Fund. In that capacity ASI was to process billings, contract with Fund service providers, and screen charges. ASI actually was established in part to provide $2,000 a month in kickbacks to Goldblatt, Tomasso, and defendant Louis Fenza, a friend of Michael Franzese who served as Allied's vice president when Tomasso was president. Fenza later succeeded Tomasso as union president and trustee of The Fund in 1984.

49. The Fund's first payment to ASI was made in April 1983 by a $12,000 check payable to defendant Court Investment, Inc., ("Court") because ASI was not yet in existence. Court was another company founded earlier by Leo Bloom solely for the purpose of laundering money. ASI received $14,000 a month in administrative fees from June through December, 1983, for a total of $110,000.

50. ASI entered into its agreement with the Fund on May 1, 1983. At that time ASI did not have an office, any clients, nor had it ever provided this type of service to another client. In fact, ASI was not incorporated until twenty-two days later.

51. Trustees Sacino, Van Cise and Green failed to inquire about and thus were unaware of ASI's lack of history or experience, and did nothing to inform themselves of its corporate non-existence, inexperience, or relationship to Bloom. On or about May 11, 1983, the Trustees approved the retention of ASI. At that time the Trustees, other than Tomasso, were unaware that the Fund had already contracted with ASI on May 1, and that ASI had not yet been incorporated when the contract was approved.

52. ASI's contract with the Fund was terminated by telegram from Tomasso on January 24, 1984. The only available information concerning claims paid by ASI on behalf of the Fund is that during the period from May through October of 1983 the Fund transferred to ASI, in addition to the monthly fee described above, a total of $77,750 for payment of claims.

53. Administrative expenses for all expenditures other than for payment of Fund benefits should have amounted to no more than 10% of the Fund's income. Applying that 10% rate the Fund expended $1,779,-

835 more than it should have in administration during the period 1980–1985.

54. Fees paid to ASI should have been limited to no more than 10% of claims paid, with an additional 5% for start-up costs. Inasmuch as ASI administered $77,750 of claims paid, and its contract was terminated in the first year, it should have received as its fees $11,662.50 (15% of $77,750). The difference of $98,337.50 constituted unnecessary and excessive administrative expenses.

## COMPENSATION PAID TO UNION EMPLOYEES AND TRUSTEES

55. From 1977 through 1985, the various Trustees caused the Fund to pay compensation and exenses to several employees of Allied, including defendants Herman Jaffe, Salvatore Ponte, Anthony Tomasso, and Eugene Brown. The reimbursed expenses at issue here represent only those expenses for which no receipts were submitted to the fund; expenses not described below were paid by the Fund to union employees for which receipts were submitted. In addition, defendants Tomasso and Fenza caused the Fund to make payments to themselves as compensation while they served as trustees of the Fund.

56. Trustees Nicolosi, Van Cise, Sacino and Green were not aware of the amounts the union's employees were receiving from the Fund. Moreover, the union's employees who received compensation from the Fund did not keep records of how much time they allegedly spent on Fund, as opposed to union, business. It is also evident that virtually all of the work performed by union employees that was of any benefit to the Fund was done primarily to encourage security guards to either join the union or to remain in the union. The activities of the union's employees in distributing Fund information materials to participants was done primarily for union organizing. Defendant Jaffe testified that his primary function was to organize for the union, and that he spent 95% of his time doing that.

57. During the period 1980–1982, defendant Jaffe received a total of $117,209 from the Fund in salary and undocumented expenses while he was a union employee. During the same period, defendant Ponte received a total of $90,162 from the Fund in salary and undocumented expenses while he was a union employee. Defendant Eugene Brown received from the Fund, in salary and undocumented expenses, a total of $9,818 during the period 1981–82, and an additional $5,676 in 1983. In addition, the Trustees caused the Fund to pay to three other union employees, Anthony Miceli, Albert Fenza (Louis Fenza's father), and Peter Scalia, in salary and undocumented expenses, a total of $71,638 during the period 1980–1982, and an additional $11,089 in 1983.

58. Defendant Tomasso received from the Fund, in salary and undocumented expenses, a total of $76,672 during the period 1981–1982, and an additional $34,420 in 1983. His salary from the union in 1983, when he received the $34,420 in compensation from the Fund as trustee, was $95,658.

59. In 1984, after he succeeded Tomasso as union president and Fund Trustee, defendant Louis Fenza received $9,115 in salary and undocumented expenses from the Fund. His salary from the union during the same period was $82,746.

## FUND PAYMENT OF UNION'S TAXES

60. On March 12, 1984, the Internal Revenue Service notified Allied that it was levying upon Allied for nonpayment of taxes and statutory additions in 1982 and 1983 in the amount of $12,751.24. On or about March 23, 1984 Trustees Fenza, Brown, Van Cise and Green approved the Fund's payment of the union's debt to the IRS in that amount. This sum was repaid by the union to the Fund on July 20, 1984, with interest of $510.04.

## THE PREPAID LEGAL PROGRAMS

61. After July 1981, the Fund twice contracted with law firms to provide legal services benefits to Fund participants. Both of these legal services programs were provided on a closed panel basis (*i.e.*, Fund participants did not have a choice of lawyers from whom they could receive benefits) in Long Island, New York, and were paid for by the Fund on a flat fee per month basis, without regard to the number

of participants in the Fund or the number of participants utilizing the program. An earlier legal services program had been discontinued on October 1, 1980 because of underutilization by Fund participants.

62. The first program at issue was provided by the firm of Schneider & Taubman, effective April 1, 1981 until November 15, 1982. The Schneider & Taubman firm was paid $20,000 per month, plus an additional $20,000 at the inception. There is no evidence that Trustees Cunningham and Nicolosi sought more than one proposal prior to retaining Schneider & Taubman. In fact, Nicolosi testified at his deposition that he did not know of the existence of this program, or that the Fund had paid the Schneider & Taubman firm $330,000 over a 15½ month period.

63. The utilization summary submitted to the Fund by Schneider & Taubman in August 1982 showed that for the six month period ending July 31, 1982, the firm had provided benefits to 262 participants. As of November 15, 1982, the program was terminated because of underutilization.

64. The second legal services program at issue was provided by Peter Roth for a four month period, from November 1983 through February 1984, when it was terminated because of underutilization. Roth had offered to provide the program at a cost of $1.50 per Fund participant per month, but the Trustees subsequently caused the Fund to enter into an agreement with Roth by which he was paid $10,000 per month, a rate of $4.17 per participant per month.

65. No plans other than that proposed by Roth were considered.

66. A total of 24 Fund participants utilized the Roth program during the four months of its existence, and no utilization report was provided to the Fund's trustees until after the program was terminated.

67. Mr. Roth's proposal of $1.50 per participant per month was appropriate for the level of benefits to be provided and there was no apparent reason for the Fund to pay Mr. Roth $10,000 per month, or $4.17 per participant per month based on 2,400 participants in 1983, for the same level of benefits. The Fund paid Mr. Roth $40,000 for a legal services plan which should have cost $14,400.

## ALLIED INTERNATIONAL UNION FAILED TO ACT IN THE INTEREST OF THE FUND

68. Allied (the "Union") had the authority to appoint and remove all Union Trustees of the Fund. The Union controlled the selection and removal of the Trustees of the Fund. The Union was aware of the actions and omissions of the Fund Trustees in: (a) purchasing the C.D.s of Dome Insurance Co.; (b) incurring administrative expenses; and (c) controlling the legal services program. In addition, the Union was aware of the prohibited loans from Bloom and IFS to Anthony Tomasso and was further aware of the improper expenses and gifts made by Bloom.

The Union, through its officers and its selections, made sure Union officers acted in their own interests in using the Fund as its assets and for its own account, and are liable for the damage to the Fund.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action pursuant to section 502(e)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(e)(1). Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). The Secretary of Labor has authority to bring this action pursuant to ERISA §§ 502(a)(2) and (5), 29 U.S.C. § 1132(a)(2) and (5).

2. The Fund is an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1).

3. As trustees of the Fund, defendants Anthony Tomasso, Daniel Cunningham, Ted Nicolosi, Annette Sacino, Frank Van Cise, Robert Green, Louis Fenza, and Eugene Brown were fiduciaries with respect to the Fund within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

4. ERISA is a comprehensive statute enacted to:

protect ... the interests of participants in employee benefit plans and their beneficiaries ... by establishing standards of

conduct, responsibility, and obligations for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

5. The fiduciary standards of ERISA were derived from the common law trusts, and have been federalized and codified with recognition of the special purposes and characterizations of employee benefit plans.

■ 6. Section 404 of ERISA, 29 U.S.C. § 1104, sets forth a fiduciary's basic duties as derived from traditional trust law principles. Central among these is the trustee's duty to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

7. Prudence is measured according to an objective standard developed in the common law of trusts. The Court's task is to determine whether the fiduciaries, at the time they engaged in the challenged transaction, employed the appropriate methods to evaluate the merits of the transaction.

8. In addition to the general fiduciary duties of loyalty and prudence, ERISA also regards specific types of transactions between a plan and related persons, known as "parties in interest," as inherently susceptible to abuse. Section 406(a) of ERISA, 29 U.S.C. § 1106(a), generally prohibits these transactions. To avoid the prohibitions of section 406(a), the transaction must meet the requirements of one or more of the narrow exemptions provided by section 408, 29 U.S.C. § 1108. In addition to the prohibitions of section 406(a), section 406(b), 29 U.S.C. § 1106(b), prohibits plan fiduciaries from placing themselves in a conflict of interest situation where their loyalty to the plan may be divided.

### PURCHASES OF DOME
### CERTIFICATES OF
### DEPOSIT

■ 9. As fiduciaries, the trustees had a duty to act with care, skill, prudence and diligence in their management of the Fund. Their conduct must be measured against that of a prudent person in a like capacity who is familiar with such matters. The evidence showed that none of the trustees was familiar with making investments, particularly a specialized investment such as the purchase of a certificate of deposit ("CD") of a property and casualty insurance company. Yet the trustees did not investigate the feasibility of the investments or the financial soundness of Dome. They reviewed no financial statements or insurance company ratings. They consulted no one expert in the field of investing in insurance companies. In short, they did not adhere to the standard of conduct of a similarly situated prudent investor. In fact, from Anthony Tomasso's testimony it is apparent that the investments in Dome merely constituted a scheme to kick money back to him and other members. Accordingly, the trustees failed to act solely in the interest of the Fund's participants and beneficiaries, and with the care, skill, prudence, and diligence required by ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).

■ 10. By committing between 25% and 89% of the available Fund assets to the Dome investments, the trustees violated their duty to diversify Fund assets so as to minimize the risk of large losses. ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C).

■ 11. Defendant Mitchell Goldblatt knowingly participated in the trustees' breaches of fiduciary duty committed with respect to the loans to Dome by actively participating in the scheme by which funds were channeled from Dome to Goldblatt himself, Tomasso and others. Goldblatt furthered the scheme by failing to advise the trustees other than Tomasso of the kickback scheme. Accordingly, defendant Goldblatt is equally responsible with the breaching fiduciaries for the losses suffered by the Fund as the result of the imprudent loans to Dome, and is liable for all such losses without regard to the amount of money he personally received from the transaction.

## LOANS TO TOMASSO

12. By causing the Fund to purchase certificates of deposit from Dome Insurance Co. at or about the time he and his wife received loans totalling $177,200 and other cash from defendants Leo Bloom and IFS, defendant Tomasso dealt with Fund assets in his own interest or for his own account, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1). In addition, by receiving money from Dome for his own account while acting as a Fund fiduciary, defendant Tomasso received consideration for his own personal account from a party dealing with the Fund in connection with a transaction involving Fund assets, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3). Accordingly, defendant Tomasso is liable for all losses to the Fund resulting from the loans to Dome, even without regard to the prudence violations discussed above. By engaging in prohibited self-dealing and receiving payoffs in connection with investments he helped set in motion, Tomasso renders himself personally liable for all losses inflicted upon the Fund through these investments.

## UNION'S DEPOSITING AND RETAINING OF FUND CONTRIBUTIONS

13. By permitting or authorizing Allied to deposit and retain for its own account employer contributions intended for the Fund, defendants Cunningham, Tomasso, Nicolosi, Van Cise, Green, Sacino, Fenza, and Brown failed to act solely in the interest of the Fund's participants and beneficiaries, for the exclusive purpose of providing benefits, and with the care, skill, prudence, and diligence that a prudent man would have used, in violation of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B). These defendants also caused the Fund to engage in a transaction which they knew or should have known constituted a direct or indirect lending of money or extension of credit to, and use of Fund assets by or for the benefit of, a party in interest, in violation of ERISA §§ 406(a)(1)(B) and (D), 29 U.S.C. §§ 1106(a)(1)(B) and (D). Accordingly, the Union, as a party in interest, may be compelled to restore to the Fund the sums of money it has retained as a result of the prohibited transaction. In addition, as officers of Allied and trustees of the Fund, defendants Cunningham, Tomasso, and Fenza dealt with assets of the Fund in their own interest, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1). Further, these defendants also acted in a transaction involving the Fund on behalf of a party (i.e., the Union) whose interests were adverse to the interests of the Fund and its participants and beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

14. The trustees further violated their duties under ERISA by entering into the June 1984 and 1986 promissory notes, by which Allied was to repay to the Fund the employer contributions withheld, when the trustees knew that the payback schedules were insufficient to meet the terms of the loan and that the Union had made no effort to repay the money owed to the Fund. Accordingly, the trustees and the Union are liable to restore to the Fund the amount of the contributions presently owing to the Fund by the Union, plus interest.

## ADMINISTRATIVE EXPENSES

15. By causing or allowing the Fund to expend excessive sums of money on administration without adequate record keeping and monitoring, defendant trustees Cunningham, Tomasso, Nicolosi, Van Cise, Green, Sacino, Fenza, and Brown failed to act solely in the interest of the Fund's participants and beneficiaries, for the exclusive purpose of providing benefits and defraying reasonable administrative expenses, and with the care, skill, prudence, and diligence that a prudent man would have used, in violation of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B). In addition, defendant Cunningham violated ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by causing the Fund to reimburse Allied, as part of its administrative expenses in 1981 and 1982, for time he allegedly spent on Fund business.

16. The trustees violated ERISA §§ 404(a)(1)(A) and (B) in retaining and pay-

ing compensation to defendant ASI. The trustee defendants failed to act as competent plan administrators in selecting, retaining, monitoring, and compensating ASI for the inadequate services it rendered for the Fund.

17. ASI knowingly participated in the trustees' breaches of fiduciary duty by facilitating kickbacks to Fund fiduciaries and by willfully failing to disclose material information to the trustees. ASI intentionally concealed the facts that it was founded and controlled by Leo Bloom and Larry Lauver, in part to provide kickbacks to Fund fiduciaries. ASI also concealed the fact that it had no experience in performing any of the services it was being retained to provide. In addition, ASI was aware of the fees it received from the Fund and of the inadequate services it was providing for those fees. Under these circumstances, the Court concludes that ASI knowingly furthered the trustees' breaches of fiduciary duty by facilitating kickbacks.

## COMPENSATION TO UNION EMPLOYEES AND TRUSTEES

18. The payments to union employees, who were parties in interest with respect to the Fund within the meaning of ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H), were prohibited by section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), unless the exemption provided by ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2), is applicable. Section 408(b)(2) provides:

The prohibitions provided in section 406 shall not apply to ... contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan if no more than reasonable compensation is paid therefor.

19. The requirements of section 408(b)(2) were not met in this case. First, the employer trustees, defendants Nicolosi, Van Cise, and Green, were not even aware of the amounts the union employees were receiving from the Fund. Second, the union's employees who received compensation from the Fund did not keep records of how much time they allegedly spent on Fund, as opposed to Union, business. Thus, it cannot be said that the payments were made pursuant to a reasonable arrangement.

20. In addition, it appears that virtually all of the work performed by these individuals that was of any benefit to the Fund was done primarily to encourage employees either to join the Union or to remain in the Union. Payment by the Fund for such activities was not "necessary for the establishment or operation of the plan" within the meaning of section 408(b)(2) of ERISA.

21. Among the Union employees who received payments from the Fund as compensation, Herman Jaffe, Salvatore Ponte, Anthony Tomasso, and Eugene Brown have been made defendants. These defendants have admitted receiving the sums from the Fund with knowledge of the pertinent facts concerning their activities on behalf of the Union and the payments from the Fund. Under these circumstances, the Court finds that these defendants knowingly participated in the prohibited transactions from which they profited. As parties in interest, the three defendants may also be compelled to make restitution for the sums they received as a result of the prohibited transactions.

22. Insofar as each Fund trustee caused payments to be made to fellow trustees, the same provisions of section 408(b)(2) discussed above apply, except that in determining whether compensation paid to a fiduciary is reasonable within the meaning of section 408(b)(2). ERISA § 408 (c)(2), 29 U.S.C. § 1108(c)(2), provides:

Nothing in section 406 shall be construed to prohibit any fiduciary from ... receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan; except that no person so serving who already receives full-time pay from an employer or an association of employers, whose employees are participants in the plan, or from an employee organization whose members are participants in such plan shall receive compensation from such plan, except for re-

imbursement of expenses properly and actually incurred.

Thus, to meet the exemption requirements of section 408(b)(2), the trustees must show (a) that the services of the fiduciary were necessary for the establishment or operation of the plan and furnished under a contract or arrangement which was reasonable, and (b) that the fiduciary was not already receiving "full time pay" from an employer or from an employee organization whose members are participants in the plan.

23. In determining whether a fiduciary received full time pay from a related employer or employee organization, the focus is:

> not on the hours devoted to the second job or function, but on the amount of payment received. [The] aim is to prevent double payment from a party in interest and thus avoid the conflicts dual allegiance may spark. A weekly salary of even $250 is sufficient to create an impermissible interest tension.

24. For the same reasons discussed with respect to the compensation paid to employees of the Union, the compensation paid to the trustees did not meet the requirements of section 408(b)(2). In addition, it is clear from the Court's findings above that the trustees who received compensation from the Fund were already receiving full time pay from the Union. Accordingly, the payments to the trustees were not exempt under the provisions of sections 408(b)(2) and 408(c)(2).

25. In addition to the compensation which the Fund trustees caused to be made to each other, two of the trustees, defendants Anthony Tomasso and Louis Fenza, caused the Fund to make payments as compensation to themselves. ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), which prohibits fiduciaries from dealing with plan assets in their own interest or for their own account, clearly prohibit these two defendants from paying themselves from Fund assets. Moreover, the exemptive provisions of sections 408(b)(2) and 408(c)(2) apply only to violations of section 406(a), not violations of section 406(b). Thus, neither of the exemptions is applicable to these violations.

## PAYMENT OF UNION'S TAXES

26. By causing the Fund to pay the Union's taxes to the Internal Revenue Service, defendant trustees Fenza, Brown, Van Cise, and Green failed to act solely in the interest of the Fund's participants and beneficiaries, for the exclusive purpose of providing benefits, and with the care, skill, prudence, and diligence that a prudent man would have used, in violation of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B); caused the Fund to engage in a transaction which they knew or should have known constituted a direct or indirect lending of money or other extension of credit between the Fund and a party in interest, in violation of ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B); and caused the Fund to engage in a transaction which they knew or should have known constituted a direct or indirect transfer of Fund assets to, or use of Fund assets by or for the benefit of, a party in interest, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

27. In addition, defendants Fenza and Brown, as officers of Allied and trustees of the Fund, dealt with assets of the Fund in their own interest in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

## THE LEGAL SERVICES PROGRAMS

28. In providing the legal services benefits, in order to fulfill their fiduciary duties, the trustees should have considered the needs of the Fund participants and an appropriate level of benefits, and then should have solicited multiple proposals and competently evaluated the proposals before entering into an agreement. The trustees failed to properly monitor utilization of the programs, and caused the Fund to pay excessive sums for the benefits that were provided. For these reasons, the trustees violated the exclusive purpose and prudent requirements of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).

UNION'S FAILURE TO ACT IN THE IN-
TEREST OF THE FUND IN AP-
POINTING AND REMOVING FUND
TRUSTEES

29. By virtue of its authority to appoint and remove the union trustees, and by effectively controlling the selection of employer trustees, defendant Allied both had and exercised discretionary authority and control respecting management of the Fund. Accordingly, Allied was a fiduciary with respect to the Fund within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

30. By selecting and appointing Fund trustees in its own interest and in the interest of persons who intended to (and did) use Fund assets in their own interest and for their own account, and by failing to take appropriate steps to remove Union-appointed trustees who it knew were breaching their fiduciary obligations to the Fund, defendant Allied failed to act solely in the interest of the Fund's participants and beneficiaries, for the exclusive purpose of providing benefits, and with the care, skill, prudence and diligence that a prudent man would have used, in violation of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).

## RELIEF

31. Section 409(a) of ERISA, 29 U.S.C. § 1109(a), provides that a fiduciary who breaches duties imposed by ERISA:

shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

Consistent with the broad language of ERISA § 409(a), the remedial nature of ERISA, and the liberal construction traditionally given to the Act, this Court has broad discretion in determining the appropriate relief to be accorded on behalf of the Fund.

32. To remedy the ERISA violations in this case, defendants will be required to make the Fund whole for all monetary losses, and to disgorge all sums and other consideration they received.

33. With respect to the loans to Dome, the Court will hold defendants Leo Bloom, Philip Bloom, Mitchell Goldblatt, and Anthony Tomasso jointly and severally liable for all monetary losses suffered by the Fund as a result of the purchase by the Fund of all six certificates of deposit of Dome Insurance Co. (totalling $590,000 plus the $2,600 interest penalty incurred in connection with the purchase of the fifth CD). The Court also will hold defendant Theodore Nicolosi liable for all monetary losses suffered by the Fund as a result of the purchase by the Fund of the first certificate of deposit of Dome ($120,000), and defendants Robert Green, Annette Sacino, and Frank Van Cise jointly and severally liable for all monetary losses suffered by the Fund as a result of the Fund's purchases of the second, third, fourth, fifth and sixth certificates of deposit of Dome (totalling $470,000, plus the $2,600 interest penalty incurred in connection with the purchase of the fifth CD).

34. With respect to defendant Tomasso's vacation in the Virgin Islands, the Court will hold defendants Leo Bloom and Anthony Tomasso jointly and severally liable for the sum of $1,697.95 ($1,242.45 lodging plus $262.50 rental car plus $193 as value to Tomasso of excursion plane) paid by Bloom on Tomasso's behalf.

35. With respect to the union's withholding of Fund contributions, defendants Eugene Brown, Daniel Cunningham, Louis Fenza, Robert Green, Theodore Nicolosi, Annette Sacino, Anthony Tomasso and Frank Van Cise are liable for the sums of employer contributions which they permitted or authorized the Union to withhold from the Fund during the time they served as trustees of the Fund. In addition, Allied, as a party in interest, is liable to restore to the Fund all such sums it has retained as a result of the prohibited transactions (totalling $265,472.76), plus interest.

36. With respect to the administrative expenses, defendants Eugene

Brown, Daniel Cunningham, Louis Fenza, Robert Green, Theodore Nicolosi, Annette Sacino, Anthony Tomasso and Frank Van Cise are liable for the excessive sums (totalling $1,799,835) they allowed or caused the Fund to pay as administrative expenses during the time they served as trustees of the Fund. In addition, defendants Court Investment Co., Inc. and Administrative Systems, Inc. are liable to disgorge the full amount of compensation ($110,000) they received from the Fund.

■ 37. The compensation paid to union employees and the trustees constitutes a part of the Fund's overall administrative expenses, and losses to the Fund as a result from the excessive administrative payments. Nevertheless, the Court holds defendants Eugene Brown, Daniel Cunningham, Louis Fenza, Robert Green, Theodore Nicolosi, Annette Sacino, Anthony Tomasso and Frank Van Cise liable for the sums they caused or allowed the Fund to pay as compensation to defendants Anthony Tomasso ($111,092), Louis Fenza ($9,115), Eugene Brown ($15,494), Herman Jaffe ($117,-209), and Salvatore Ponte ($90,162), as well as to Anthony Miceli, Albert Fenza and Peter Scalia (totalling $82,727). In addition, the Court also holds defendants Anthony Tomasso, Louis Fenza, Eugene Brown, Herman Jaffe and Salvatore Ponte liable for the sums they received as compensation from the Fund listed above. The Secretary, however, must offset any sums recovered on these claims against the amount due from the fiduciary defendants on the administrative expense claims, other than as to the payments to ASI and Court Investment Co.

■ 38. With respect to the legal services programs, the Court holds defendants Daniel Cunningham, Robert Green, Theodore Nicolosi, Annette Sacino, Anthony Tomasso and Frank Van Cise liable for the excessive sums they caused the Fund to pay to the law firm of Schneider & Taubman ($230,800) and to Peter Roth ($25,600) from the legal services programs during the time they served as trustees of the Fund.

39. In sum, and consonant with the above Findings and Conclusions, and the Court's granting of the Secretary's motions for entry of default judgment as to the non-appearing defendants, defendants shall be ordered to pay to the Fund, within thirty days of the entry of judgment herein, the following sums:

| | |
|---|---:|
| ASI | $ 110,000 |
| L. Bloom | 594,297 |
| P. Bloom | 592,600 |
| Brown | 723,509 |
| Court Inv. | 110,000 |
| Cunningham | 1,544,567 |
| Fenza | 708,015 |
| Goldblatt | 592,600 |
| Green | 1,913,299 |
| Jaffe | 117,209 |
| Nicolosi | 1,664,567 |
| Ponte | 90,162 |
| Sacino | 1,205,284 |
| Tomasso | 1,550,155 |
| Union | 265,472 |
| VanCise | 1,396,878 |

■ 40. Since the Fund has been denied the use of the sums described above that were wrongfully expended, the Court awards prejudgment interest at the adjusted prime rate set by the Secretary of the Treasury pursuant to 26 U.S.C. §§ 6621 and 6622.

■ 41. Congress intended to make available the full range of legal and equitable remedies in cases of ERISA violations. *See* S.Rep. No. 93–127, reprinted in 3 *U.S.Code Cong. and Admin.News* 4639, 4838, 4871 (1974). Accordingly, injunctive relief is available including an injunction to prohibit a party from having further dealings with ERISA-covered plans. In light of the seriousness of the ERISA violations that have occurred, the Court awards injunctive relief as follows.

■ 42. With respect to defendants Anthony Tomasso, Kathleen Tomasso, Daniel Cunningham, Theodore Nicolosi, Frank Van Cise, Robert Green, Annette Sacino, Louis Fenza, Mitchell Goldblatt, Leo Bloom, Philip Bloom, Administrative Systems, Inc., Court Investment Co., Inc. and International Financial Services, Ltd., the Court will enter a permanent injunction to prohibit them from acting as fiduciaries of, or providing services to, any ERISA-covered employee benefit plan.

43. With respect to each of the other individual defendants, Eugene Brown, Herman Jaffe, and Salvatore Ponte, the Court

will enter an injunction to prohibit them for a period of ten years from acting as fiduciaries of, or providing services to, any ERISA-covered employee benefit plan.

44. With respect to defendant Allied International Union, the Court will enter a permanent injunction to require the Union to: (1) exercise prudence in appointing trustees to the subject Fund and any other ERISA-covered employee benefit plan that the Union sponsors; (2) take reasonable steps to monitor the actions of trustees it appoints to the subject Fund and any other ERISA-covered employee benefit plan that the Union sponsors; (3) remove any trustee it has appointed to the subject Fund (or any other plan that the Union sponsors) who it knows to be in breach of his fiduciary obligations to the Fund (or such other plan); and (4) transmit promptly, and in no event more than ten days from date of receipt, to the subject Fund (or other plan that the Union sponsors) any sums of money the Union receives which belong to the subject Fund (or such other plan).

45. With respect to all defendants, the Court will enter a permanent injunction prohibiting them from violating, or inducing any other person to violate, any of the provisions of Title I of ERISA.

46. Finally, with respect to the Secretary's request for costs of suit, the Court will require defendants to compensate the Secretary for the fees of court reporters for the transcripts of depositions necessarily obtained for use in this case.

47. Counsel for the Secretary shall prepare and submit a proposed judgment, incorporating the amount of prejudgment interest awarded, in accordance with the foregoing.

SO ORDERED.